# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Crystal Moses**

    **v.**                      Case No. 10-cv-253-PB
                                    Opinion No. 2012 DNH 074

**Mark Mele**

## MEMORANDUM AND ORDER

On July 15, 2008, Crystal Moses accompanied her son's girlfriend, Catherine Sims, to the Lebanon police department. When Officer Mark Mele sought to speak to Sims alone, Moses protested and the situation became heated.  After Moses escorted Sims out of the police station and back to their car in the parking lot, she was arrested for witness tampering.  She was subsequently prosecuted.  Moses now brings suit against Officer Mele for unlawful arrest under the Fourth Amendment and malicious prosecution under New Hampshire law.  Officer Mele has filed a motion for summary judgment.  For the reasons stated below, I grant that motion.

## I.  BACKGROUND

### A.  Facts

Sims and her boyfriend, Kyle Moses ("Kyle"),[1] were living together in the house of Kyle's mother, Crystal Moses ("Moses").

---

[1] I refer to Kyle Moses by his first name only to avoid confusion in distinguishing him from his mother.

Pl.'s Dep. at 14, Doc. No. 29-4.  On July 12, 2008, Kyle and
Sims were involved in an automobile accident in Lebanon, New
Hampshire.  Kyle called his mother, who arrived quickly at the
location of the crash.  Id. at 12.

Officer Mele was dispatched to the accident.  Based on
information that he gathered at the scene, Officer Mele arrested
Kyle for his conduct before, during, and after the accident.[2]

On July 15, Officer Mele called Sims.  He told her that the
statement she had given about the accident differed from Kyle's
statement, and he asked if she could come down to the police
station to answer some questions.  Sims agreed to go, but on the
condition that Moses could accompany her and be present during
questioning.[3]  Probable Cause Hr'g at 5, Doc. No. 31-6.

Moses drove Sims to the station and sat with her in the
lobby.  When Officer Mele approached and asked Sims to follow
him to an interview room, Moses stood up to go with Sims.

---

[2] The parties agree that Kyle's conduct is not relevant to the
claims in this case.

[3] Officer Mele accepts this account of the phone call for the
purpose of the summary judgment motion, but notes that he was in
the process of conducting a criminal investigation of Kyle and
believed he had acquiesced to allow Sims' own mother, and not
Moses (Kyle's mother), to accompany Sims.  Probable Cause Hrg.
at 17, Doc. No. 31-6; Def.'s Mem. Supp. Summ. J. at 2 & n.1,
Doc. No. 31-1.

Officer Mele stopped Moses, telling her: "[Y]ou're going to have to stay here.  I'm going to interview [Sims] alone."  Def.'s Dep. at 99, Doc. No. 35.  Moses registered her displeasure, and Officer Mele then asked Sims if she would speak with him alone "for one second."  Id.  Moses did not object, and Sims stepped into a hallway with Officer Mele.

Officer Mele reminded Sims that her statement about the accident contained inconsistencies, and he told her that he would not speak to her with Moses in the room.  He warned her that Moses had accompanied her not to protect her interests, but rather to safeguard the interests of her son.  Sims responded that she would not speak to Officer Mele alone and would have to call her mother.  Officer Mele cautioned Sims against leaving the police station, and threatened to put out a warrant for her arrest if she left.  Probable Cause Hr'g at 6, Doc. No. 31-6.  Sims said that she "had to go tell [Moses] what the situation had turned into."  Id.  Moses, who could see the conversation through a glass divider, observed that Sims was becoming distressed and was starting to cry.

When Sims rejoined Moses in the lobby, Moses stated to her, "I don't think you have to talk to him alone and [] you should either call your mother or leave."  Pl.'s Dep. at 18-19, Doc.

No. 31-4.[4]  Moses asserts that while she and Sims were speaking,
Officer Mele began to "talk[] at [Sims] very assertively and
somewhat aggressively and telling her that if she left he was
going to arrest her and that she needed to speak with him and
things to that effect."  Id. at 19.  At that point, Moses put
her arm around Sims's back, and escorted Sims out of the
station.  Id. at 20.  A surveillance video of the two walking
out of the station shows Moses's arm around Sims, and although
the video is quite choppy, no pushing or untoward force is
apparent.

    As Moses ushered Sims toward her Jeep in the parking lot,
Officer Mele followed a few steps behind.  Upon reaching Moses's
car, Sims immediately entered it and sat down in the front
passenger-side seat.  The door next to her remained open.  Moses
stood adjacent to the car, holding the open door as she spoke
with Officer Mele.  In her deposition, Moses explained that her
intent was "to get outside and keep [Officer Mele] from
badgering [Sims] until her mother came and could comfort and
support her."  Pl.'s Dep. at 27, Doc. No. 31-4.  Officer Mele

---

[4] The language in Moses's interrogatory is slightly different
than the language quoted above, which comes from her deposition
testimony.  In the interrogatory, she claims that after the
incident she reported telling Sims that "she did not have to do
that [i.e. speak alone with Officer Mele] and she should call
her mother."  Pl.'s Interrog. #15, Doc. No. 31-8.

continued to "badger" the two women while they were outside, however, repeatedly telling Sims that she should not leave the premises.  Moses told Sims that they "should leave because the officer was being a threatening bully and obviously trying to manipulate her."  Pl.'s Inter. #15, Doc. No. 31-8.

After approximately a minute outside with Moses and Sims, Officer Mele called for assistance.  Several officers responded, rapidly emerging from the nearby police station.  Moses had closed the passenger door just prior to the officers' arrival, but reopened it as they reached her car.  Officer Mele directed the officers to separate Moses from Sims and to detain Moses. Officer Mele explained to his supervisor, Corporal Gerald Brown, that "he wanted to speak alone with Sims but Moses told Sims she could not and then Moses [] physically escorted Sims out of the station."[5]  Brown Dep. at 9, Doc. No. 34-5.  Based on that information, Corporal Brown believed that there was probable cause to arrest Moses for witness tampering, and he instructed another officer to take her into custody.  Id. at 8-9.

---

[5] According to Moses's reading of the transcript of Corporal Brown's deposition, Officer Mele told his supervisor that Sims wanted to speak with him alone.  Pl.'s Obj. to Summ. J. ¶ 21, Doc. No. 34.  I believe Moses misreads the transcript, and that according to Corporal Brown, Officer Mele told him that he wanted to speak with Sims alone.

After Moses was taken into the station for processing,
Officer Mele and others continued to talk to Sims.  Sims's
mother, who had been called at some point during or just after
the preceding events, eventually arrived at the department and
sat with Sims during an interview.  Mele Dep. at 109, Doc. No.
35; Probable Cause Hr'g at 21-22, Doc. No. 31-6.  Before she
left the station, Sims also provided and signed a short written
statement giving her account of the events that had transpired
that day involving Moses and Officer Mele.[6]

---

[6] Sims's statement is inconsistent with her subsequent testimony
and with Moses's version of the facts on two factual issues
disputed by Officer Mele: whether Sims had agreed to speak alone
with Officer Mele, and whether Moses used force to push Sims out
of the police station and into her car.  In its entirety, Sims's
statement reads:

> On Today July 15, 2008 I came into the station
> voluntarily about a statement I made.  Officer Mele
> came into the Lobby[.]  Crystal said she would come in
> with me.  He asked to speak with me alone.  I did so.
> He said it would be in my best interest to stay here.
> I said OK let me tell crystal.  Crystal said no you
> shouldnt talk to them alone.  She brought me outside
> told me not to go inside I called my mom told her to
> come meet me.  I told her I was going to stay and wait
> for my mom.  She pushed me outside and into the jeep.
> So I couldnt talk to anyone at the station.

Sims's Statement, Doc. No. 31-9.  In light of conflicting
evidence on the disputed issues, however, I must accept Moses's
account for the purposes of this summary judgment motion.

**B.**   <u>**Proceedings on the Criminal Charges against Moses**</u>

On July 20, Officer Mele issued a criminal complaint against Moses.  In it, he swore that Moses, "believing that an investigation and report of a crime was about to be instituted," did "knowingly attempt to induce Catherine Sims to withhold information."  Criminal Compl., Doc. No. 37, Ex. 2.  He elaborated on the basis for the crime, explaining that Moses told Sims "not to talk with the police about the incident and physically escort[ed] her out of the police station and into her car, then slamm[ed] her arm in the door to take her away from the police station, when Sims wanted to give a statement about the incident."  <u>Id.</u>

A probable cause hearing was held on September 23 at the Lebanon District Court, and Sims and Officer Mele both testified.  Probable Cause Hr'g, Doc. No. 31-6.  Moses contended that probable cause was lacking because there was no evidence that she had the specific intent to induce Sims to withhold information from the police.  <u>Id.</u> at 39.  She argued that her clear intent was simply to advise Sims and to ensure that someone -- either herself or Sims's mother -- was present for Sims's interview.  <u>Id.</u> at 40-41.  Justice Cirone ruled against Moses:

. . . I'm going to find probable cause.  It strikes me
that there's enough here, at least from -- at the
stage where I'm at, to find that there was more than
simply asking as an advisor or a counselor.

I could accept, perhaps, your argument if the
only thing in front of me was a statement from Ms.
Moses to Ms. Simms [sic], I don't think it's in your
best interest to talk with this officer, he doesn't
want me, number one; or number two, it's clear he
doesn't want me in the room, so therefore, you know,
you should call you mother or someone else who you're
comfortable with, having in the room.  And it stops at
that point.  But I think there's more facts here that
have been presented that seem to go beyond that
counseling role, enough certainly to continue the
charge, as far as I'm concerned.

Id. at 43.

On November 21, 2008, Moses was indicted for witness

tampering.  At the grand jury hearing, Lieutenant Scott Rathburn

testified for the State.  He had no first-hand knowledge of the

facts of the case, and testified based on the information

contained in police reports.  Rathburn Dep. at 13-14, Doc. No.

36.

On March 9, 2009, Moses filed a motion to dismiss the

criminal charges, arguing that the witness tampering statute

violated her right to free speech and was unconstitutional under

the First and Fourteenth Amendments to the United States

constitution because it was facially overbroad and vague.  Mot.

to Dismiss, Doc. No. 34-11.  Although the State filed an

objection, prior to the hearing on Moses's motion the State

decided not to proceed with the prosecution.  On the indictment, a signed notation dated June 15, 2009, reads: "Nol prossed due to witness problems."  Indictment, Doc. No. 31-10.

## II.  <u>STANDARD OF REVIEW</u>

A summary judgment motion should be granted when the record reveals "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.   ANALYSIS

#### A.   Claims, Elements, & Essence of Dispute

Moses contends that Officer Mele is liable for false arrest under the Fourth Amendment and for malicious prosecution under state law.[7]

The absence of probable cause is an element of both a false arrest claim under the Fourth Amendment and a malicious prosecution claim under New Hampshire law.  The Fourth Amendment, which prohibits "unreasonable searches and seizures," is violated when a police officer arrests an individual without probable cause.  See U.S. Const. Amend. IV; Michigan v. Summers, 452 U.S. 692, 697 (1981) (stating the "general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause").  The state-law tort of malicious prosecution occurs "when a plaintiff has been subjected to a criminal prosecution instituted by the defendant without probable cause and with malice, terminating in the plaintiff's favor." State v. Rollins, 129 N.H. 684, 687 (1987) (citation and internal punctuation omitted).

---

[7]  Moses has agreed to dismiss her claims against Officer Mele for unlawful seizure under the Fourth Amendment, interference with her rights of speech and association under the First Amendment, violation of her substantive due process rights under the Fourteenth Amendment, and false arrest under state law.

The parties agree that the central issue in this case is whether Officer Mele had probable cause to arrest and prosecute Moses for witness tampering.  Officer Mele makes several arguments for why summary judgment is appropriate.  He first contends that two state proceedings -- the probable cause hearing and the grand jury indictment -- each preclude Moses from now arguing that probable cause was lacking.  He next argues that even if Moses is not precluded from contesting the existence of probable cause, he is entitled to summary judgment because the undisputed facts establish that he had probable cause.  Finally, he asserts that even if there is a genuine issue of material fact on the question of probable cause, he is entitled to qualified immunity on the constitutional claim and official immunity on the state-law claim.

Construing the record in the light most favorable to Moses, I determine that the presence of probable cause was at least arguable, and that a person in Officer Mele's position could reasonably have believed that he had probable cause to arrest Moses.  As such, Officer Mele is shielded from the unlawful arrest suit by qualified immunity.  For similar reasons, he retains official immunity from liability on the state-law malicious prosecution claim.  In light of my determinations, I need not reach Officer Mele's preclusion arguments.

11

**B.    Unlawful Arrest**

    **1.    Qualified Immunity & Probable Cause Standards**

    The doctrine of qualified immunity protects public officials from personal liability that arises out of their performance of discretionary functions.  Barton v. Clancy, 632 F.3d 9, 21 (1st Cir. 2011).  It attaches when officials "make reasonable but mistaken judgments," and it shields from suit "all but the plainly incompetent or those who knowingly violate the law."  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (citation omitted).  A court engaging in a qualified immunity analysis must consider two prongs: "(1) whether the facts alleged or shown by plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011) (quoting Maldanado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).  The prongs may be resolved in any order.  Id.

    The inquiry into whether a right was "clearly established" encompasses both the clarity of the law at the time of the violation, and whether, in light of the particular facts of the case, "a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights."  Id. (quoting Barton, 632 F.3d at 22) (alteration in original).  In

the context of a Fourth Amendment claim arising out of an
allegedly unlawful arrest, police officers "are entitled to
qualified immunity 'so long as the presence of probable cause is
at least arguable.'"  Id. at 88 (quoting Ricci v. Urso, 974 F.2d
5, 7 (1st Cir. 1992)).  In other words, so long as a reasonable
officer in the circumstances could believe that probable cause
was present, qualified immunity will attach.

Probable cause exists when a police officer has
"information upon which a reasonably prudent person would
believe the suspect had committed or was committing a crime."
United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006)
(quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).
It is a "common sense, nontechnical conception that deals with
the factual and practical considerations of everyday life on
which reasonable and prudent men, not legal technicians, act."
United States v. Pontoo, 666 F.3d 20, 32 (1st Cir. 2011)
(quoting Vongkaysone, 434 F.3d at 73-74.  Probable cause does
not require, however, evidence sufficient to demonstrate that a
suspect more likely than not committed the crime, so long as the
circumstances "reveal[] a probability or substantial chance of
criminal activity on the suspect's part"  United States v.
Mounts, 248 F.3d 712, 715 (7th Cir. 2001) (quoting United States
v. Sawyer, 224 F.3d 675, 678-79 (7th Cir. 2000)).

13

A court inquiring into the existence of probable cause must conduct its evaluation "from the perspective of a reasonable person in the position of the officer." Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009). The inquiry is an objective one that should take into account the totality of the circumstances, and should focus on what the officer knew at the time the arrest occurred, though not on the officer's "actual motive or thought process." Id. (citation omitted); see also Vongkaysone, 434 F.3d at 73-74.

## 2.   **Analysis**

Under New Hampshire law, a person commits the crime of witness tampering if, "[b]elieving that an official proceeding . . . or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a person to . . . [w]ithhold any testimony [or] information . . . ." N.H. Rev. Stat. Ann. § 641:5(I)(b). Three elements are apparent: (1) an attempt (2) to induce or cause a person to withhold information or testimony (3) while believing an official proceeding is pending. See id. Moses's argument focuses on the absence of any criminal intent, without which her conduct during the events in questions cannot constitute witness tampering. She contends that a reasonable person in Officer Mele's position could not

14

have believed that she was acting with the purpose of causing Sims to withhold information.

Moses presents two related arguments to support her contention that Mele could not have reasonably believed that she acted with a culpable state of mind. First, she argues that her decision to bring Sims to the police station to be interviewed precludes any argument that her later actions were intended to cause Sims to withhold information. Second, she claims that her actions after she reached the police station and her contemporaneous statements about those actions conclusively establish that she acted to prevent Sims from being harassed and interviewed without her mother present, and not to cause Sims to withhold information from the police. I find neither argument persuasive.

I agree that Moses' decision to bring Sims to the interview suggests that she was willing to have the police interview Sims if Moses could be present for the interview. That decision, however, tells us little as to what Moses was thinking later, after she learned that she would not be allowed to be present for the interview. It is undisputed that Moses' son was the target of Office Mele's investigation and, therefore, she had strong reasons to attempt to manage his interview with Sims. Once she learned that she would not be afforded that

15

opportunity, it is entirely possible that she changed her mind
and decided to prevent the interview from taking place.

Further, although Moses' contemporaneous statements to
Officer Mele tend to support her current position that she
escorted Sims from the police station merely to prevent her from
being harassed and interviewed without her mother present,
Officer Mele was not required to accept her statements as true
when the rest of the evidence tells a different story.  See Cox
v. Hainey, 391 F.3d 25, 32 n.2 (1st Cir. 2004) (noting that a
police officer has "no obligation to give credence to [a
suspect's] self-serving statements"); Rodriguez v. Farrell, 294
F.3d 1276, 1278 (11th Cir. 2002) ("a police officer need not
credit everything a suspect tells him").

In the present case, Moses escorted Sims from the police
station even though Officer Mele had informed her Sims was not
free to leave.[8]  Given these circumstances, and Moses' motive to
protect her son from a potentially damaging interview, a
reasonable officer could have concluded that there was probable
cause to believe that Moses was acting with a culpable intent
when she escorted Sims from the police station.  Because the

---

[8]  Because Sims is not a party, I take no position on whether
Officer Mele had the power to prevent Sims from leaving the
police station.

remaining elements of the witness tampering charge are not in dispute, Officer Mele is entitled to qualified immunity with respect to Moses' false arrest claim.

## C.   **Malicious Prosecution & Official Immunity**

Malicious prosecution is a state-law cause of action. Accordingly, Officer Mele cannot defend himself by resort to qualified immunity.  Nonetheless, the New Hampshire Supreme Court has recently held that defendant police officers can avail themselves of official immunity in suits where plaintiffs allege common-law torts.  See Everitt v. Gen. Elec. Co., 156 N.H. 202, 219 (2007).  I determine that Officer Mele is entitled to official immunity, and I therefore grant his motion for summary judgment on the malicious prosecution claim.

"Official immunity protects government officials or employees from personal liability for discretionary actions taken by them within the course of their employment or official duties."  Id. at 214; see also N.H. Rev. Stat. Ann. § 99-D:1 (codifying common law doctrine of official immunity for officers and employees of the state).  A central policy underlying the immunity is that "those whom the State calls upon to exercise judgment and discretion cannot reasonably be expected to face the possibility of personal liability whenever that judgment proves to be imperfect."  Tilton v. Dougherty, 126 N.H. 294, 299

(1985).  In assessing whether a police officer has official immunity, a three-prong standard governs: immunity attaches for "decisions, acts or omissions that are (1) made within the scope of [one's] official duties while in the course of [his or her] employment; (2) discretionary, rather than ministerial; and (3) not made in a wanton or reckless manner." Everitt, 156 N.H. at 219.  It is evident that Officer Mele's filing of the criminal complaint satisfies the first two prongs, and Moses has presented no facts or argument to suggest otherwise.  Thus, the only remaining issue is whether Officer Mele acted wantonly or recklessly when he decided to prosecute Moses.

The New Hampshire Supreme Court has provided little guidance in the official immunity context as to what might constitute "wanton or reckless" conduct.  In an advisory opinion primarily addressing the withdrawal of sovereign immunity, the court explained that government employees should be immune from prosecution if they acted with a reasonable belief in the lawfulness of their conduct.  See Opinion of Justices, 126 N.H. 554, 564-65 (1985); see also Soltani v. Smith, 812 F. Supp. 1280, 1300 (D.N.H. 1993) (interpreting the New Hampshire Supreme Court's advisory opinion as "conditioning official immunity for intentional torts upon the employee's reasonable belief in the lawfulness of his conduct").  And in a separate line of

jurisprudence, the court has explained that "reckless or wanton" is a mens rea that is greater than negligence but less than intentional.  Thompson v. Forest, 136 N.H. 215, 220 (1992) ("The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong." (emphasis deleted)) (quoting Prosser & Keaton on Torts § 8 (5th ed. 1984)); see also Migdal v. Stamp, 132 N.H. 171, 176 (1989) (finding the defendants' conduct reckless or wanton when, despite their awareness of their minor son's instabilities and dangerous propensities, they failed to seek medical treatment for him and allowed him access to weapons).

The New Hampshire Supreme Court has not yet determined whether its "reasonable belief" standard for official immunity has both objective and subjective components.  Even if it does, however, both aspects of the reasonable belief requirement are satisfied here.  On the subjective level, there is simply no evidence in the record to support a claim that Officer Mele believed that he lacked probable cause when he elected to proceed with Moses' prosecution.  To the contrary, it is undisputed that he sought a supervisor's advice prior to

19

charging Moses, and that shortly after initiating the charge, Officer Mele obtained a probable cause determination from a state court judge.  These are hardly the actions of an officer who was acting from a subjective belief that he lacked probable cause to prosecute.  Moreover, Moses has not pointed to any circumstantial evidence that would call into question Officer Mele's intent by tending to show that he did not believe in the lawfulness of his conduct.  Accordingly, even if proof of a subjective belief is a component of the official immunity test, it has been satisfied here.

With respect to the objective component of the official immunity test, Moses has not attempted to distinguish probable cause to arrest from probable cause to prosecute.[9]  Thus, she does not contend that even if probable cause was a close question at the time of arrest, subsequent emerging facts changed the calculus before Officer Mele caused a charge to be filed against Moses.  Therefore, my prior determination that probable cause was arguable at the time of arrest leads to the

---

[9] Although Moses draws attention to the criminal complaint's reference to "knowing[]" conduct despite the purposeful mens rea necessary for a conviction under the witness tampering statute, she does so only to highlight Officer Mele's purported unfamiliarity with the elements of the crime.  See Pl.'s Obj. to Mot. for Summ. J. ¶ 53-54, Doc. No. 34.  She does not argue the existence of any defect in the criminal proceedings that might provide alternative grounds for liability.

20

same conclusion with respect to the later decision to institute charges against her.  Moses has not argued that the objective component of the state's reasonable belief test differs in any way from the qualified immunity test.  Accordingly, for the reasons set forth above in my discussion of qualified immunity, I also determine that Officer Mele is entitled to official immunity with respect to the malicious prosecution charge.

### IV.  CONCLUSION

For the reasons stated above, I grant Officer Mele's motion for summary judgment (Doc. No. 31).  The clerk shall enter judgment accordingly and close the case.  Although I have determined that Officer Mele is not subject to civil liability, I do not intend by this order to condone either his decisions or his conduct.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 24, 2012

cc:  Brian Robert Marsicovetere, Esq.
     Daniel J. Mullen, Esq.

21